Daniel WEBSTER, et al., Plaintiffs,

v.

FULTON COUNTY, GEORGIA, et al., Defendants.

No. CIV. A. 196–CV–2399–TWT.

United States District Court, N.D. Georgia, Atlanta Division.

June 11, 1999.

---

Richmond Mason Barge, Parks Chesin & Miller, Patrick W. McKee, McKee & Barge, Atlanta, for Daniel Webster, Peggy Webster, Webster Green Thumb Company, and others similarly situated, plaintiffs.

Linda T. Walker, Office of Fulton County Attorney, Keith Mark Wiener, Holland & Knight, J. Scott Carr, Altman Kritzer & Levick, Atlanta, for Fulton County, Georgia, Mitch J. Skandalakis, Michael Hightower, Nancy A. Boxill, Emma I. Darnell, Gordon L. Joyner, Tom Lowe, Robert E. Fulton, individually and in their official capacities as members of the Fulton County Board of Commissioners, Michael Cooper, individually and in his official capacity as Director of Contract Compliance, defendants.

## ORDER

THRASH, District Judge.

This is a race and sex discrimination case brought pursuant to 42 U.S.C. §§ 1981 and 1983, and the Equal Protection Clause of the Fourteenth Amendment. Beginning on May 11, 1999, the Court conducted a bench trial spanning over six days on the issue of whether Defendant Fulton County's 1994 Minority and Female Business Enterprise ("MFBE") Program is in violation of the Equal Protection Clause. The trial was then adjourned for two days for the Court to review the documentary evidence. The Court heard closing arguments on May 24, 1999. Based on the evidence admitted at trial and the Court's findings of facts and conclusions of law as set forth below, the Court concludes that the 1994 MFBE Program violates the Equal Protection Clause and is therefore unconstitutional.

### I. BACKGROUND

The remaining named Plaintiffs in this case are Daniel Webster (white male), Peggy Webster (white female), and The Webster Green Thumb Company ("Green Thumb"). Plaintiff Daniel Webster is the current owner of Green Thumb, a landscaping and tree removal service. The remaining Defendants are Fulton County and Michael Cooper, former Director of the Department of Contract Compliance and Equal Employment Opportunity ("Department") for Fulton County. As part of their discrimination action, the Plaintiffs allege that Fulton County has operated since September 16, 1994, an unconstitutional affirmative action program, the 1994 MFBE Program. Plaintiffs assert that the 1994 MFBE Program unreasonably and unlawfully burdens and discriminates against businesses based solely on the race and/or sex of the businesses' owners. The Plaintiffs' principal claim is that Fulton County operates an illegal MFBE program that favors minorities and females in the award of contracts for goods and services. The Plaintiffs request a declaratory ruling

from this Court that Fulton County's 1994 MFBE Program is unconstitutional. (Doc. 35). They further seek an injunction to forbid further implementation of the 1994 MFBE Program, together with affirmative injunctive relief.

Fulton County adopted its first minority business enterprise program in 1979. The Fulton County Board of Commissioners at that time resolved to begin an affirmative action program with a goal that at least 20% of all County public contracts be awarded to minority bidders. The Board passed resolutions continuing the program in 1984 and 1987. The 1987 resolution established the Office of Contract Compliance and Equal Employment Opportunity. In 1988, Defendant Cooper was hired as its first Director. In September, 1988, the Board adopted a Female Business Enterprise Resolution and requested a study of discrimination against female business owners. This resulted in the February, 1989, Fulton County Female Business Enterprise Study by Beth Shapiro & Associates and the Coalition of 100 Black Women ("Shapiro Study"). (Def.Exh. 214). In the Shapiro Study, it was noted that "[n]o historical data are available from any source within Fulton County regarding the extent of usage of female businesses by the Purchasing Department because the vendor list does not distinguish female businesses." (*Id.* at iii). This data was not available from any other source within Fulton County. (*Id.* at 24). The Shapiro Study did provide extensive anecdotal evidence of barriers to female businesses in doing business with the County. This evidence included the testimony at a public hearing in October, 1989. At this hearing it was revealed that most of the participants never considered County contracts as a viable source of business for a variety of reasons. These reasons ranged from the types of services female-owned businesses typically provide and the difficulty in mainstreaming these professional services through the purchasing and contracting process to the difficulties associated with any small business such as bonding requirements. (*Id.* at 31). The Shapiro Study recommended the adoption of specific numerical contract goals. (*Id.* at 32). It recommended a goal of 5% without any real explanation as to the goal's calculation. (*Id.* at 33).

In January, 1989, the Supreme Court struck down a municipal minority set-aside program and adopted a strict scrutiny standard of review for such programs in the future. In response, the Board and the City of Atlanta commissioned Dr. Andrew F. Brimmer and Dr. Ray Marshall to conduct a fact-finding study relating to the participation of minorities and females in the City of Atlanta and Fulton County marketplace. The purpose of the study was to allow the City of Atlanta to reintroduce its minority and female business development program. Drs. Brimmer and Marshall also studied whether discrimination against minority-owned and female-owned business enterprises ("MFBEs") has reduced their participation in the public and private sector contracting and procurement activities in the Atlanta and Fulton County marketplace. In 1990, Drs. Brimmer and Marshall produced and submitted to the County and City of Atlanta the Brimmer–Marshall Study which consisted of eight volumes entitled "Public Policy and Promotion of Minority Economic Development: City of Atlanta and Fulton County." (Def.Exh. 146). Dr. Thomas Boston, an economics professor, prepared a report included in the Brimmer–Marshall Study entitled "Discrimination and Economic Development: Effects on Minority and Female Business Enterprises."

In April and June, 1992, Fulton County conducted open public hearings in which numerous individuals provided further anecdotal evidence regarding their experiences in the Fulton County contracting and procurement activities and practices in the Atlanta/Fulton County marketplace. On October 21, 1992, the Board passed a resolution accepting the findings of the Brimmer–Marshall Study. This resolution also authorized a Female Business Enterprise Program and adopted the 5% goal

recommended by the Shapiro Study. The Board then passed another Resolution that authorized the implementation of a MFBE Program under the auspices of Defendant Cooper as the Director of the Department. (Def.Exh. 200). The 1992 MFBE Program utilized minority and female participation goals of 25% for African–Americans, 1% for Hispanics, 1% for Asian–Americans, 1% for Native Americans and 5% for female business enterprises. (Def.Exh. 204, p. 19).

In 1994, the Board engaged Dr. Boston to conduct a post-disparity study. Dr. Boston submitted this Post–Disparity Study to the Board in June, 1994. (Def.Exh. 21). On June 15, 1994, the Board approved and adopted Dr. Boston's Post–Disparity Study on June 15, 1994. The Board then directed that the Department implement amendments to the MFBE Program based on the Post–Disparity Study. On July 20, 1994, the Board passed a resolution adopting certain amendments to the MFBE Program based upon the Post–Disparity Study. The Program became effective on September 16, 1994.

The stated purpose of the 1994 MFBE Program was to alleviate the effects of past and present discrimination against minority and female business enterprises and to enhance contracting opportunities for minority and female businesses. (Pl. Exh. 1 at 1, 10). The 1994 MFBE Program provides that it shall expire five years from its effective date. (Id. at 55). As stated in the 1994 MFBE Program, the Board "considered and determined that there are no reasonable race and gender neutral alternatives or policies available which alone will accomplish the amelioration and remedy the effects of past and present discrimination." (Id. at 9). The 1994 MFBE Program sets forth the following annual business participation goals for the following groups: (1) African–American business enterprises—26%; (2) Hispanic business enterprises—1%; (3) Asian–American business enterprises—1%; (4) Native American business enter-

prises—1%; and (5) Female business enterprises—6%. (Id. at 16–17).

The 1994 MFBE Program provides that these goals are in effect for five years and are subject to an annual review and adjustment by the Department and approval by the Fulton County Manager and Board. (Id. at 17). Pursuant to the MFBE Program, the participation goals for minority and female business enterprises are not considered to be fixed quotas. (Id. at 19). The participation goals for each project or contract are set by the Department's Director based on the following non-exclusive list of factors: (1) the number of minority and female business enterprises known to be available for the type and value of service to be obtained; (2) a forecast of all eligible contracts to be awarded within the coming fiscal year, specifying the type and value of goods and services to be obtained; (3) the minority and female business enterprise percentages of the total number of business entities known to be available for the type and value of goods and services to be obtained; (4) the statistical and data sources by which each goal was calculated; and (5) the statistical and data sources from the 1994 Post–Disparity Study. (Id. at 18–19).

The 1994 MFBE Program further provides that the good faith efforts of a potential contractor to meet minority and female business participation goals shall be considered in deciding contract awards. (Id. at 19). These good efforts include, but are not limited to: (1) attendance at pre-bid meetings which are scheduled to inform minority and female business enterprises of prime and subcontracting opportunities; (2) advertisements in general circulation media, trade association publications, and minority and female enterprise media to provide notice of opportunities; (3) written notice to known minority and female business enterprises soliciting their interest in opportunities; (4) efforts made to select portions of work for minority and female businesses subcontracting in areas likely to be successful; (5) efforts to negotiate

with minority and female businesses for specific subcontracting; (6) efforts made to assist minority and female businesses to meet bonding, insurance, or other governmental contracting requirements; (7) a statement of reasons why a particular minority or female business enterprise contacted is not qualified for a contract; and (8) communication with the Department seeking assistance for identifying minority and female business enterprises. (*Id.* at 19–20, 34–35).

The MFBE Program applies "to the totality of Fulton County procurement and contracting, including construction and the acquisition of all commodities, equipment, goods and services (including professional services), however titled and irrespective of the modality or manner procured, and irrespective as to whether purchased or leased." The initial categories established by the Board that were encompassed under the MFBE program are listed as (1) construction; (2) commodities; (3) services; and (4) professional services. (*Id.* at 22–23). Fulton County reserved the right to amend these categories upon recommendation by the Fulton County Manager and the Board. (*Id.* at 22).

The 1994 MFBE Program provides that the Department shall evaluate and set appropriate minority or female business participation goals for each specific project or contract. (*Id.* at 25). The Department should consider (1) the nature of the project or contract and the relevant specifications; (2) the availability of minority and female business enterprises in various industry classifications and professions which are ready and able to provide goods and services on the particular project or contract; (3) the level of participation of such firms on past projects or contracts awarded by Fulton County; and (4) other relevant factors. (*Id.* at 26). The MFBE Program proposes several methods to achieve the minority and female business participation goals as follows:

(1) *Minority and Female Business Enterprise Solicitations on Procurement Purchase Orders.* For all purchases, each Fulton County buyer and any other Fulton County employee having the authority to procure is required to contact at least one minority or female business enterprise bidder.

(2) *Joint Ventures Program.* The Department shall encourage, where economically feasible, establishment of joint ventures and mentor protege programs to insure prime contracting opportunities for minority or female business enterprises on eligible projects. If the prime contractor is a minority or female business enterprise or a joint venture between minority and female firms, subcontracting participation with minority and female business enterprises shall be required on all projects exceeding $10,000,000.

(3) *Mentor/Protege Ventures.* The Department encourages mentor/protege programs to assist individual minority and female business enterprises in financing, bonding, construction management and technical assistance.

(4) *Minority and Female Business Enterprise Subcontracting and Supplier Purchasing Goals on Construction Projects and Other Contracts.* The Department shall ensure the maximum practicable opportunity for minority and female business participation by requiring that all bidders on a designated project or contract comply with certain remedial measures.

(5) *Construction Subcontracting.* The Department may impose a requirement that bidders wanting to serve as prime contractors on a bid for a Fulton County construction project identified under Program Scope shall subcontract with minority and female business enterprises for a stated percentage of the dollar value of the project.

(6) *Subcontractor Participation.* Where a prime contractor utilizes one or more subcontractors to satisfy its minority or female business participation commitment, the prime contractor may count only expenditures to minority and female business enterprise contractors

that perform a commercially useful function in the contract work.

(7) *Suppliers Participation.* Where a prime contractor utilizes one or more suppliers to satisfy its minority or female business participation commitment, credit will be given toward the applicable goal as follows: (1) 100% of the contract amount for minority and female business suppliers who manufacture the goods supplied; (2) 100% of the contract amount for minority and female business suppliers who are wholesalers warehousing the goods supplied; and (3) where an extraordinarily large portion of the contract price is for equipment or supplies, a lower project goal may be set than otherwise would be required.

(8) *Professional Services.* Where Fulton County requires the utilization of professional consultants, the Department shall make knowledgeable · and available minority or female business enterprises aware of opportunities to serve as primary consultants on bids.

(*Id.* at 27–33).

The 1994 MFBE Program provides that the Department's Director may grant administrative waivers where reasonable good faith efforts are established, where the situation is deemed to be an emergency, and where deemed appropriate by the Director, the Fulton County Manager and the Board. (*Id.* at 36). A bidder or offeror may seek a partial or total waiver of the project goals. The application for a waiver shall include documentary evidence of the bidder's or offeror's good faith efforts to meet the project goals and why the request should be granted. (*Id.* at 37).

The 1994 MFBE Program contains a section entitled "Race and Gender Neutral Business Opportunity Assistance Measures." (*Id.* at 39). In this section, the 1994 MFBE Program provides that the Department has developed a comprehensive and multifaceted Outreach Program in an effort to increase participation among MFBEs in the Fulton County bid process. (*Id.* at 40). The section also lists several other race and gender neutral opportunity business measures consisting of the following: (1) the Fulton County Purchasing Department, with the assistance of the Department, shall investigate the extent to which non-competitive procurement modalities such as sole source, multi-year, blanket and emergency purchases have been utilized excessively or unnecessarily to the detriment of competition; (2) the Department, Purchasing Department, Project Management Department, and using departments shall identify large Fulton County contracting opportunities to determine whether they may be segmented into two or more smaller bids to provide increased contracting opportunities for small businesses; (3) the Purchasing Department shall determine whether it is appropriate to segment multi-bids to provide increased procurement opportunities for MFBEs who may not have submitted bids on all items requested; (4) the Department and other appropriate departments will conduct seminars and workshops on how to do business with Fulton County; (5) the Department will work closely with local governmental entities in providing bonding assistance; (6) the Department shall assist small businesses in locating available financial resources within the Atlanta area; (7) the Department shall act as a clearinghouse for information on financial assistance programs for small businesses; (8) the Department will offer services to assist small businesses in construction management and technical services; (9) when a contract or service award has been made, the Department's Director and the purchasing agent shall furnish, upon request, a letter to the contractor stating the information that may be utilized by the MFBE to establish lines of credit with lending institutions and manufacturers; (10) Fulton County may make special provisions for reasonable progress payments during the performance of a contractual obligation by small MFBEs; and (11) Fulton County shall enforce all existing policies and regulations relating to the prompt payment of its bidders. (*Id.* at 40).

The 1994 MFBE Program provides that all firms participating as either a minority or female business enterprise must be certified before the award of a bid or execution of a contract after review and evaluation as to compliance. (*Id.* at 45). In determining whether a firm is eligible to be certified, any minority or female firm engaged in or attempting to engage in business in the Fulton County Metropolitan Statistical Area before July 20, 1994, is rebuttably presumed to have suffered past racial or gender discrimination and is therefore an eligible minority or female business enterprise. In order to be a certified minority or female business enterprise, the firm or joint venture must comply with certain eligibility standards regarding minority or female control and ownership of the firm or joint venture. (*Id.* at 47–49). The Department reviews whether there is sufficient minority or female operational or managerial control so that the firm can be certified. (*Id.* at 49–51).

The 1994 MFBE Program provides an appeals process for any contractor, bidder or offeror who has been denied certification as an MBE or FBE or against whom a determination has been made of non-compliance with the program policy requirements. (*Id.* at 51–52). A notice of appeal must be filed with the Department's Director who will then forward the notice to the Department's Hearing Officer. (*Id.*). The Department's Hearing Officer, after conducting a hearing, will then issue a decision either affirming, altering or reversing the determination of non-compliance or denial of certification by the Department's Director. The Invitation to Bid/Request for Proposal used by Fulton County lists the "requirements for all bidders interested in doing business with Fulton County." (Pl.Exh. 2). Item 28 of the requirements states that: "Fulton County has a minority and female business enterprise participation program. Failure to comply with this program may result in rejection of a bid." (*Id.*). The foregoing historical facts are undisputed. To the extent that decision of the case requires

resolution of factual disputes, those matters are discussed below.

## II. DISCUSSION

The present action was filed in 1996. The Plaintiffs, in part, challenge the constitutionality of Fulton County's 1994 MFBE Program and seek a declaratory judgment and an injunction against the further implementation of this program. Based on the evidence admitted at the bench trial, the Plaintiffs contend that Defendant Fulton County has failed to demonstrate either a compelling or important governmental interest in using racial or gender classifications as a basis to award contracts. They contend that Fulton County has failed to show sufficient evidence of actual discrimination, whether active or passive, to justify any program of racial or gender preference. The Plaintiffs further contend, based upon the admitted evidence, that the race and gender-conscious 1994 MFBE Program is not narrowly tailored to remedy specifically identified discrimination. The Defendants contend that the Fulton County 1994 MFBE Program is constitutional based on evidence identifying past discrimination against minority and female business enterprises. Based on the evidence admitted, the Defendants contend that Fulton County had a compelling interest in remedying past discrimination and that Fulton County properly considered and implemented race and gender-neutral remedies. The Defendants contend that the 1994 MFBE Program is narrowly tailored to remedy past discrimination based on its flexibility toward reaching goals and its graduation, waiver and sunset provisions.

## A. STANDING

At various times during the pendency of this action, the Defendants have questioned whether the Plaintiffs have standing to bring their constitutional claims. At the bench trial, the Defendants again challenge whether any of the Plaintiffs (Green Thumb, Daniel Webster, and

Peggy Webster) have standing to challenge the constitutionality of the 1994 MFBE Program. The Defendants also contend that the Websters have no standing to challenge the remaining constitutional claims. The Court concludes that Green Thumb has standing to challenge the program based on the evidence admitted at the bench trial and the reasons stated in the Court's order addressing the parties' summary judgment motions. In addressing an affirmative action set-aside program for contractors' services, the Supreme Court has stated that:

> When the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that he would have obtained the benefit but for the barrier in order to establish standing. The "injury in fact" in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit. And in the context of a challenge to a set-aside program, the "injury in fact" is the inability to compete on an equal footing in the bidding process, not the loss of a contract. To establish standing, therefore, a party challenging a set-aside program ... need only demonstrate that it is able and ready to bid on contracts and that a discriminatory policy prevents it from doing so on an equal footing.

*Northeastern Florida Chapter of the Associated General Contractors of America v. City of Jacksonville, Fla.,* 508 U.S. 656, 666, 113 S.Ct. 2297, 2303, 124 L.Ed.2d 586 (1993). The Plaintiff Green Thumb has demonstrated that it is able and ready to bid on contracts and that a discriminatory policy prevents it from doing so on an equal footing. (Pl.Exh. 1, 206, 207). The Plaintiffs acknowledge that Daniel and Peggy Webster have no standing to chal-

lenge the constitutionality of the 1994 MFBE Program. The Court will reserve ruling on whether the Websters have standing to assert a claim for monetary damages.[1]

### B. LEGAL STANDARDS FOR SCRUTINIZING PREFERENCE PROGRAMS

The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o State shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV. The Supreme Court in *City of Richmond v. J.A. Croson Co.,* 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989), has set forth the constitutional standard applicable for programs establishing racial or ethnic preferences. The Court applied the strict scrutiny test, which requires a "searching judicial inquiry into the justification" for the preference to determine whether the classifications are remedial or "in fact motivated by illegitimate notions of racial inferiority or simple racial politics." *Id.* at 493, 109 S.Ct. at 721. The strict scrutiny test is therefore designed to expose "illegitimate uses of race by assuring that the legislative body is pursuing a goal important enough to warrant use of a highly suspect tool" and to "ensure that the means chosen 'fit' this compelling goal so closely that there is little or no possibility that the motive for the classification was illegitimate racial prejudice or stereotype." *Id.*

Accordingly, the strict scrutiny test requires that racial or ethnic preference programs "must be based upon a 'compelling governmental interest' and must be 'narrowly tailored' to achieve that interest." *Engineering Contractors Assoc. of South Florida, Inc. v. Metropolitan Dade County,* 122 F.3d 895, 906 (11th Cir. 1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1186, —— L.Ed.2d —— (1998) (citation omitted). Explicit racial preferences

---

1. Because Green Thumb is the only Plaintiff with standing to challenge the constitutionali-

ty of the 1994 MFBE Program, the Court will refer herein to Green Thumb as "Plaintiff."

may not be used except as a "last resort." *Id.* at 926. To uphold a racial or ethnic preference program, the district court must first make a factual determination that a strong basis in evidence exists to support the conclusion that the remedial racial or ethnic program is necessary. *Croson,* 488 U.S. at 500, 109 S.Ct. at 725; *Engineering Contractors,* 122 F.3d at 906. General, amorphous claims of societal discrimination, simple legislative assurances of good intention, or congressional findings of discrimination in the national economy are not sufficient to establish a "strong basis in evidence." *Engineering Contractors,* 122 F.3d at 907. Racial or ethnic preference programs, however, can be justified by demonstrating gross statistical disparities between the proportion of minorities hired for projects or contracts, and the proportion of minorities willing and able to do the work. *Id.* Anecdotal evidence may be used to establish discrimination, especially if buttressed by relevant statistical evidence. *Id.* Accordingly, in this case, if Fulton County can show that it has become a " 'passive participant' in a system of racial exclusion practiced" in connection with the awards of projects and contracts in the county, the Supreme Court has made it "clear that the [county] could take affirmative steps to dismantle such a system." *Croson,* 488 U.S. at 492, 109 S.Ct. at 721.

■ If there is a strong basis in evidence to justify a race or ethnic conscious program, the next step requires courts to consider whether the program is sufficiently narrowly tailored to achieve that interest. Racial and ethnic preferences must be a "last resort" option. *See Engineering Contractors,* 122 F.3d at 926. Such programs must be "vigorously scrutinized to ensure that they do not go too far." *Id.* at 927. The following four factors, as identified by the Eleventh Circuit, provide a useful analytical structure for determining whether a race or ethnicity-conscious program is narrowly tailored: (1) necessity for the relief and the efficacy of alternative remedies; (2) the flexibility and duration of the relief, including availability of waiv-

er provisions; (3) the relationship of numerical goals to the relevant labor market; and (4) the impact on the rights of innocent third-parties. *Engineering Contractors,* 122 F.3d at 927.

■ Intermediate scrutiny is the applicable constitutional standard for analyzing programs that establish gender preferences. *Engineering Contractors,* 122 F.3d at 907–08. Thus, to withstand constitutional challenge to a gender preference program, such gender preference must serve important governmental objectives and be substantially related to achievement of those objectives. *Id.* The proponent of a gender preference program must present sufficient probative evidence of discrimination. *Id.* at 910. The Eleventh Circuit recognized that the "sufficient probative evidence" standard is less stringent than the "strong basis in evidence" required to bear the weight of a race or ethnic preference program. *Id.* at 909–10. The following guidelines set forth the boundaries of intermediate scrutiny evidentiary analysis: (1) the local government must demonstrate some past discrimination against women, but not necessarily discrimination by the government itself; and (2) such review "is not to be directed toward mandating that gender-conscious affirmative action is used only as a 'last resort'." *Id.* at 910. "Under intermediate scrutiny, a gender-conscious program need not closely tie its numerical goals to the proportion of women in the market." *Id.* at 929.

■ In making its factual determination that either a "strong basis in evidence" or "sufficient probative evidence" exists to support the necessity of an affirmative action program, the court may consider post-enactment evidence in addition to pre-enactment evidence. *Engineering Contractors Association of South Florida, Inc. v. Metropolitan Dade County,* 943 F.Supp. 1546, 1557 (S.D.Fla.1996), *aff'd,* 122 F.3d 895 (1997). Pre-enactment evidence pertains to evidence developed before Fulton County enacted the MFBE Program, and

thus, could have been relied upon by the Board in adopting the MFBE Program. *Id.* Conversely, post-enactment evidence pertains to evidence developed after the MFBE Program was enacted and was therefore not relied upon as a rationale for the program. *Id.* The Eleventh Circuit has held that post-enactment evidence may be introduced into the record to determine the constitutionality of a race or gender preference program:

> Although *Croson* requires that a public employer show strong evidence of discrimination when defending an affirmative action plan, the Supreme Court has never required that, before implementing affirmative action, the employer must have already proved that it has discriminated. On the contrary, formal findings of discrimination need neither precede nor accompany the adoption of affirmative action.

*Engineering Contractors,* 122 F.3d at 911 (quoting *Ensley Branch, N.A.A.C.P. v. Seibels,* 31 F.3d 1548, 1565 (11th Cir. 1994)). Consideration of post-enactment evidence is appropriate when scrutinizing race or gender preference programs because a violation of either federal statutory or constitutional requirements arises when the wrong is committed, and not with the making of a finding. *Engineering Contractors,* 122 F.3d at 911 (citing *Wygant v. Jackson Bd. Of Educ.,* 476 U.S. 267, 289, 106 S.Ct. 1842, 1855, 90 L.Ed.2d 260 (1986) (O'Connor, J., concurring)). Consideration of post-enactment evidence is especially appropriate where the principal relief sought is injunctive relief. *Engineering Contractors,* 122 F.3d at 911.

■■ The Defendants bear the initial burden of production to demonstrate a "strong basis in evidence" or "sufficient probative evidence" that the race, ethnic or gender preference program aims to remedy past or present discrimination and is constitutional under the Fourteenth Amendment. *Engineering Contractors,* 122 F.3d at 916; *Concrete Works of Colorado, Inc. v. City And County of Denver,* 36 F.3d 1513, 1522 (10th Cir.1994), *cert. denied,* 514 U.S. 1004, 115 S.Ct. 1315, 131

L.Ed.2d 196(1995). Notwithstanding this initial burden of proof, "[t]he ultimate burden [of proof] remains with [the challenging party] to demonstrate the unconstitutionality of an affirmative-action program." *Concrete Works,* 36 F.3d at 1522 (quoting *Wygant,* 476 U.S. at 277–78, 106 S.Ct. at 1849). As explained by the Eleventh Circuit in the context of public employment, once the proponent of a race preference plan:

> introduces its statistical proof as evidence of its remedial purpose, thereby supplying the [district] court with the means for determining that [it] had a firm basis for concluding that remedial action was appropriate, it is incumbent upon the nonminority [employees] to prove their case; they continue to bear the ultimate burden of persuading the [district] court that the [public employer's] evidence did not support an inference of prior discrimination and thus a remedial purpose, or that the plan instituted on the basis of this evidence was not sufficiently "narrowly tailored."

*Howard v. McLucas,* 871 F.2d 1000, 1007 (11th Cir.1989) (quoting *Wygant,* 476 U.S. at 293, 106 S.Ct. at 1856 (O'Connor, J., concurring)). When statistical evidence is sufficient to support an inference of discrimination, the Plaintiff has at least the following three methods to rebut the inference of discrimination with a neutral explanation: (1) demonstrate that the statistics are flawed; (2) demonstrate that the disparities shown by the statistics are not significant or actionable; or (3) present conflicting statistical data. *Engineering Contractors,* 122 F.3d at 916.

Before examining whether the 1994 MFBE Program passes constitutional muster based on the admitted evidence, it is instructive to analyze the decisions in *Croson* and *Engineering Contractors.* In those cases, the Supreme Court and the Eleventh Circuit analyzed programs with some similar characteristics to the 1994 MFBE Program. In *Croson,* the Supreme Court struck down the City of Richmond's

minority set-aside program because the City failed to provide a strong basis in evidence establishing past or present discrimination. *Croson*, 488 U.S. at 498–506, 109 S.Ct. at 723–28. The minority set-aside program required majority-owned prime contractors to whom the City awarded construction contracts to subcontract at least 30% of the dollar amount to one or more MBEs. *Id.* at 477–78, 109 S.Ct. at 713. The Supreme Court first found unpersuasive the City's mere declaration that the set-aside program was "remedial." *Id.* at 500, 109 S.Ct. at 725. The Court then discredited the statistical pool used by the City to demonstrate discrimination in the construction industry. Although the City established a disparity between the number of prime contracts awarded to minority firms and the City's minority population, the Supreme Court found that a more appropriate comparison would be between the number of contracts awarded to minority firms and the number of qualified minority contractors. *Id.* at 501–02, 109 S.Ct. at 725–26. The Supreme Court stated that:

> Where there is a significant statistical disparity between the number of qualified minority contractors willing and able to perform a particular service and the number of such contractors actually engaged by the locality or the locality's prime contractors, an inference of discriminatory exclusion could arise. Under such circumstances, the [locality] could act to dismantle the closed business system by taking appropriate measures against those who discriminate on the basis of race or other illegitimate criteria. In the extreme case, some form of narrowly tailored racial preference might be necessary to break down patterns of deliberate exclusion.

*Id.* at 509, 109 S.Ct. at 730 (citations omitted). The Supreme Court further found that national data about discrimination in the construction industry offered little insight into the particular conditions in the City of Richmond. *Id.* at 504, 109 S.Ct. at 727.

Following *Croson,* the Eleventh Circuit in *Engineering Contractors* affirmed the district court's decision declaring the Dade County, Florida's race, ethnic and gender preference programs to be unconstitutional. *Engineering Contractors,* 122 F.3d at 900. Dade County's programs, referred to collectively as MWBE programs, set participation goals of 15% for black business enterprises ("BBEs"), 19% for Hispanic business enterprises ("HBEs"), and 11% for women business enterprises ("WBEs"). The MWBE programs applied only to construction contracts, the only classes of contracts having participation goals. To justify its programs, Dade County advanced substantial statistical and anecdotal evidence. *Id.* at 911–26. The heart of its statistical analysis consisted of Dade County contracting statistics that compared three factors for its nonprocurement construction contracts: (1) the percentage of bidders that were MWBE firms; (2) the percentage of awardees that were MWBE firms; and (3) the proportion of Dade County contracts that were awarded to MWBE firms. *Id.* at 912. The analysis covered two time periods, 1989–1991 and 1993. The Eleventh Circuit concluded that the district court did not err by failing to find a strong basis in evidence of racial and ethnic discrimination based on the disparities between bidder and awardee percentages. *Id.* at 913. Likewise, the Eleventh Circuit found no error with regard to the district court's finding of no sufficiently probative evidence of gender discrimination. *Id.*

Dade County also calculated disparity indexes with regard to the utilization of BBEs, HBEs, and WBEs in the Dade County market by comparing the amount of contract awards a particular group received to the amount it would be expected to receive based on that group's bidding activity and awardee success rate. The Eleventh Circuit found statistically significant underutilization of BBEs, less dramatic underutilization of HBEs, and mixed results as to the utilization of WBEs. *Id.* at 914–16. The Plaintiffs introduced evi-

dence that the disparities in the utilization of MWBEs are better explained by firm size than by discrimination. Dade County then conducted regression analysis to control for firm size. Despite a few unexplained disparities that remained after controlling for firm size, the district court concluded that the demonstrated disparities were better explained by firm size than by discrimination. *Id.* at 917–18. The Eleventh Circuit did not find this conclusion to be clearly erroneous. *Id.* at 918–19.

Dade County also submitted its statistics to measure the participation of each MWBE group in the County's subcontracting business. The district court found the subcontracting study "insufficiently probative to support the use of race and ethnic preferences and inadequate to support a gender classification." *Id.* at 919–20. The Eleventh Circuit concluded that this finding was not clearly erroneous. *Id.* at 920. Dade County also introduced marketplace data statistics to determine whether meaningful relationships existed between (1) the race, ethnicity and gender of the surveyed firm owners, and (2) the reported sales and receipts of those firms. The study was based on a sample of 586 contractors that had filed a "certificate of competency" with Dade County. The Eleventh Circuit noted that the parameters of the studies' universe necessarily included firms that were unwilling, unable or unqualified to perform Dade County construction contracts. *Id.* at 920–91. The study found statistical unfavorable disparities only with respect to HBEs. The district court found, however, these disparities not to be controlling based on the entirety of the evidence. *Id.* at 921. The Eleventh Circuit did not find the district court's conclusion to be clearly erroneous in light of the problems with the statistical pool. *Id.*

Next, Dade County introduced a statistical analysis of Jon Wainwright which compared construction business ownership rates of MWBEs to those of non-MWBEs and analyzed the disparities in the personal income between MWBE and non-MWBE owners. The study concluded that blacks, Hispanics and women are less likely to own construction businesses than similarly situated white males, and MWBEs in the construction business earn less money that similarly situated white males. The Eleventh Circuit found this evidence insufficient to show discrimination in light of evidence indicating the tremendous growth of MWBE firms and the fact that firm size better explained the identified disparities. *Id.* at 922–23. Finally, Dade County presented a study by Dr. Andrew Brimmer which was a historical analysis of black-owned construction firms. The study demonstrated the existence of substantial disparities for black-owned construction business receipts for some years, but not others. The Eleventh Circuit noted that the district court had discounted the significance of the unfavorable disparities because the Brimmer Study failed to account for firm size. *Id.* at 923–24. Again, the Eleventh Circuit did not find the district court's view to be implausible. *Id.* at 924.

With regard to the entire body of statistical evidence, the Eleventh Circuit stated that it "cannot hold that the district court clearly erred in finding that the statistical evidence was too weak an evidentiary foundation to bear the weight of any of the MWBE programs under the standards of review applicable to them." *Id.* The Eleventh Circuit also concluded that the anecdotal evidence was insufficient to support the MWBE programs especially without the requisite statistical foundation. *Id.* at 926. Thus, the Eleventh Circuit affirmed the district court's judgment enjoining the operation of the MWBE programs on the grounds that Dade County's failure to establish a constitutionally sufficient evidentiary foundation for the race, ethnic and gender conscious programs. *Id.*

The Eleventh Circuit further concluded that the BBE and HBE programs were not sufficiently narrowly tailored. *Id.* at 927–29. The Eleventh Circuit found that Dade County did not give serious and good-faith consideration to the use of race

and ethnicity neutral measures to increase BBE and HBE participation. *Id.* Finally, the Eleventh Circuit noted that the district court erred by drawing "no distinction between its analysis of whether [Dade] County's BBE and HBE programs were narrowly tailored and whether the WBE program bore a substantial relationship to [Dade] County's stated rationale for implementing gender-conscious affirmative action, in response to perceived discrimination against women-owned contractors." *Id.* at 929. The court stated that:

> If the WBE program rested on a sufficient evidentiary foundation, we could not conclude that it would fail the substantial relationship prong of the intermediate scrutiny analysis. However, because the district court did not clearly err in finding that [Dade] County had failed to present sufficient probative evidence in support of its stated rationale for implementing a gender preference program, the district court's error in applying the substantial relationship test does not change the result.

*Id.*

 This Court is bound to follow the precedents set by the Supreme Court and the Eleventh Circuit in this area. The Court is not at liberty to apply its own notions of what is good public policy or its own notions of the appropriate standard for reviewing minority and gender preference programs. The Court's duty is to follow the Constitution and the law as interpreted by the Supreme Court and the Eleventh Circuit. With this understanding of the controlling decisions in *Croson* and *Engineering Contractors*, the Court now turns to the evidence admitted at trial to determine whether the Fulton County 1994 MFBE Program violates the Equal Protection Clause.

## C. "STRONG BASIS IN EVIDENCE" AND "SUFFICIENT PROBATIVE EVIDENCE"

The Defendants have presented two types of evidence in support of the 1994 MFBE Program: (1) statistical evidence and (2) anecdotal evidence. The Court will review the evidence to determine whether the Defendants have demonstrated both the "strong basis in evidence" standard in connection with the race preference program and the less stringent "sufficient probative evidence" standard in connection with the gender preference program.

### 1. STATISTICAL EVIDENCE

There have been three basic categories of statistical evidence presented to the Court: (1) the 1990 Brimmer–Marshall Study; (2) the 1994 Post–Disparity Study prepared by Dr. Boston; and (3) various statistical studies covering the years 1994–1997.[2] The Court will summarize and analyze each of these categories. Whether considered individually or together, the statistical evidence presented by the Defendants fails to establish a either a strong basis in evidence for a race or ethnic preference or sufficient probative evidence of gender discrimination.

### a. The 1990 Brimmer–Marshall Study

In 1990, Drs. Brimmer and Marshall produced and submitted to Fulton County and City of Atlanta the Brimmer–Marshall Study. The Study consisted of eight volumes entitled "Public Policy and Promotion of Minority Economic Development: City of Atlanta and Fulton County." (Def.Exh. 146). Overall, the eight-volume study details discrimination against minorities and females based on historical, statistical and anecdotal evidence. In Part I, Drs. Brimmer and Marshall summarize their findings of discrimination in both the private and public Atlanta business sec-

---

**2.** The Court gives no weight to the purchase order data contained in Def. Exh. 226. The inclusion in this data of purchase orders to public agencies and charities makes the mi-

nority to non-minority comparisons meaningless. The figures also do not include minority subcontracts.

tors. They noted wide-spread discrimination in the larger more lucrative private sector. They found large disparities in public and private contracting opportunities between minority and majority firms. (Def. Exh. 146., Brimmer–Marshall Study, Part I at 88). According to the study, minority firms derived most of their revenue from the public sector, while public firms derived most of their revenues from the private sector. The Brimmer–Marshall Study further noted that there was low participation by minority business enterprises in the City of Atlanta contracting relative to the value of the contracts awarded to non-minority business enterprises. (*Id.* at 99). Dr. Boston prepared Part III of the Brimmer–Marshall Study. He concluded that MFBEs have not experienced equity in private and public markets for the procurement of contracts in Atlanta and Fulton County.

Part I of the study also contained a summary of the statistical analysis comparing the amount of contract dollars going to minority firms to the availability of minority firms in the same year. In the Brimmer–Marshall Study this was presented as a statistical relationship known as the Utilization–Percentage Ratio ("UPR"), or disparity index. This index is calculated by dividing the utilization of a certain ethnic or gender group by the availability of the same group.[3] It is the ratio of two percentages: the percentage of contracts actually awarded to minority businesses by the percentage of all businesses qualified and willing to perform contracts for Fulton County, who belong to a specific racial, ethnic or gender group. Underutilization is shown by a number smaller than one, and overutilization by a number greater than one. A UPR of .5 means that the racial or gender group in question is only receiving 50% of the contract awards or contract dollars that one would expect; that is, if a race had an availability of 20% and received only 10% of the contract awards or con-

tract dollars, this would generate a disparity index of 0.5, and show underutilization. If an ethnic group had availability of 10% and utilization of 20%, this would generate a disparity index of 2.0 and show overutilization. The Eleventh Circuit has recognized that disparity indexes greater than 80%, or .8, are generally not considered indications of discrimination. *Engineering Contractors*, 122 F.3d at 914. In the years 1972, 1977 and 1982, the UPRs, or disparity indexes, for black-owned businesses for United States, Georgia, the Atlanta Standard Metropolitan Statistical Area ("SMSA") and Fulton County computed under 20% for all industries and under 27% for construction and developers. (*Id.* at 103).

In Part V of the Brimmer–Marshall Study, the authors provided additional statistical analysis in the form of UPR calculations covering the years 1972, 1977 and 1982 for five geographic regions (United States, Georgia, Atlanta SMSA, Fulton County, and City of Atlanta). The study analyzed primarily black and minority-owned firms and covered six industrial classifications, including construction, general contractors, trade contractors and land developers. The data was collected from the U.S. Census Bureau's Survey of Minority–Owned Business Enterprises ("SMOBE"). Dr. Jon Wainwright testified at trial that he prepared this part of the Brimmer–Marshall Study. The Brimmer–Marshall Study found consistently low UPR values across all industries in the Atlanta SMSA and Fulton County, even lower than the corresponding UPRs for Georgia and the United States. It must be emphasized that all of this data looks at the marketplace as a whole.

After reviewing the Brimmer–Marshall Study, the Court finds that it is insufficient to establish a strong basis in evidence for the 1994 MFBE Program. There are two flaws in the analysis that are insurmounta-

---

**3.** Utilization can be measured in at least two ways: (1) dollars awarded, or (2) number of contracts awarded.

ble. First, the analysis in the Brimmer–Marshall Study proceeds on the premise that a statistical showing of underutilization of minorities in the marketplace as a whole is sufficient proof of discrimination to justify a program of racial preferences by a local government in whatever area is involved. This assumption is directly contrary to Justice O'Connor's analysis in *Croson*. If a statistical showing of underutilization of minorities in the marketplace as a whole is sufficient proof of discrimination to justify a program of racial preferences, such a showing as to the United States as a whole would justify racial preferences by every governing entity in the United States. General claims of societal discrimination in the marketplace are not enough to justify a race or ethnic-conscious program. *See Croson*, 488 U.S. at 499, 109 S.Ct. at 724. In *Croson*, Justice O'Connor was clear that the focus must be on contracting by the entity that is considering the preference program:

> In the case at hand, the city has not ascertained how many minority enterprises are present in the local construction market nor the level of their participation in city construction projects. The city points to no evidence that qualified minority contractors have been passed over for city contracts or subcontracts, either as a group or in any individual case. Under such circumstances, it is simply impossible to say that the city has demonstrated "a strong basis in evidence for its conclusion that remedial action was necessary." Proper findings in this regard are necessary to define both the scope of the injury and the extent of the remedy necessary to cure its effects.

*Id.* at 510, 109 S.Ct. at 730. Dr. Boston has testified that historically minorities have sought public sector work more than majority contractors. The existence of minority preference programs will have the effect of further concentrating minority business efforts in a sector where they have an advantage. For all of these reasons, statistical evidence of underutilization of minorities in the general Atlanta marketplace alone does not show discrimination by Fulton County according to *Croson*.

There is no statistical evidence in the Brimmer–Marshall Study of discrimination by Fulton County government in the award of contracts. Therefore, in order to justify racial preferences, the County must show that it is a "passive participant" in discrimination by the private sector. *Croson*, 488 U.S. at 492, 109 S.Ct. at 721; *Engineering Contractors*, 122 F.3d at 911. The Court does not accept Dr. Marshall's concept of "passive participation" as meaning any governmental contracting in a marketplace where there is discrimination. On the other hand, the County could take remedial action if it had evidence that nonminority contractors were systematically excluding minority businesses from subcontracting opportunities. *Croson*, 488 U.S. at 509, 109 S.Ct. at 730. The County could take remedial action if it had evidence that its spending practices are "exacerbating a pattern of prior discrimination" that can be identified with specificity. *Id.* at 504, 109 S.Ct. at 727. The Brimmer–Marshall Study contains no statistical data regarding the utilization of minority subcontractors by prime contractors doing business with Fulton County.[4] It does not show that the County's spending practices are exacerbating identified discrimination in the private sector. The County may rely upon a showing of discrimination in the private sector if it provides a linkage between private sector discrimination and the County's contracting policies. *Concrete Works*, 36 F.3d at 1529. No such linkage is provided by the data in the Brimmer–Marshall Study.

The second flaw is there is no statistical analysis of other factors that may affect minority business enterprise availability and utilization. Dr. Marshall testified at

---

4. Such studies have been done. For example, Dr. Boston testified that he has performed such a study for the Georgia Department of Transportation.

trial that the trouble with statistics is that they frequently conceal as much as they reveal. The Brimmer–Marshall Study does set forth statistical analysis showing disparities in the availability of minority and black-owned firms compared to their utilization in terms of dollars awarded. Nevertheless, the study contains no attempt to explain whether the disparity is due to discrimination or other neutral reasons, such as firm size and the ability of a firm to obtain financing and bonding. In Part III, Dr. Boston identifies some of these factors as having a significant impact with regard to the acquisition of public or private contracts. By contrast, Dade County in *Engineering Contractors* sought to explain through regression analyses that the disparities were due to discrimination and not due to any neutral explanations such as firm size. *Engineering Contractors*, 122 F.3d at 917–18. Regression analysis is a statistical procedure for determining the relationship between a dependent and independent variable. The purpose of a regression analysis is to determine which of a number of possible factors ("independent variables") are responsible for a given outcome. The Brimmer–Marshall Study did not utilize regression analysis to determine the cause of the disparities between minority availability and utilization in the marketplace as a whole. The data to do a regression analysis was not available. Dr. Marshall, in his trial testimony, dismissed this issue by saying that there is some residuum of underutilization that is not accounted for by neutral factors. The problem with this response is that the residuum remains unidentified and, following *Croson*, race specific goals cannot be implemented on the basis of generalizations about the existence of and the degree of discrimination. Finally, it is questionable whether Fulton County could rely upon disparities in 1972, 1977 and 1982 to enact a preference program in 1994 when more current data should have been and was available.

At trial, Dr. Marshall submitted into evidence a report showing disparity indices for 1987 and 1992, based on census and SMOBE data. This statistical study, however, was never considered by the Board in implementing the 1994 MFBE Program. This study repeats the flaws of the original Brimmer–Marshall Study by assuming that a showing of discrimination in the marketplace as a whole is sufficient to comply with *Croson*. The disparity indexes reported cover the United States, Georgia, and Atlanta SMSA regions. They are based on data that examine minority business participation in the overall economy and not just the private sector. (Def. Exh. 235 at 21). The study only reports disparity indexes as to African–American firms and does not reference any other minority group. Again, statistical analysis, like a regression analysis, was not performed to determine whether factors other than discrimination played any role in the underutilization of African–American firms. Applying *Croson* correctly, this data has the same inadequacy as the original Brimmer–Marshall Study. It is apparent from his report and his testimony at trial that Dr. Marshall disagrees with the implications of the *Croson* decision. (Def. Exh. 235 at 32). His criticism of the decision may be valid from a public policy perspective. However, this Court, unlike Dr. Marshall, is bound to follow Supreme Court precedent whatever doubts it may have about the wisdom of its decision.

Overall, the Court finds and concludes that the statistical evidence presented in the Brimmer–Marshall Study fails to provide a strong basis in evidence of discrimination against MBEs to justify Fulton County's racial and ethnic preference program. Given the flaws identified in these statistics, this study fails to show "gross statistical disparities" between the proportion of MBEs hired for projects or contracts, and the proportion of minorities willing and able to do the work for Fulton County. *See Engineering Contractors*, 122 F.3d at 908. Further, the Court finds and concludes that the Brimmer–Marshall Study, which primarily offers statistical evidence as to minority-owned firms, fails to offer sufficient probative evidence of gen-

der discrimination to justify Fulton County's gender preference program.

### b. The 1994 Post–Disparity Study

At the heart of Fulton County's statistical evidence in justifying the 1994 MFBE program is Dr. Boston's 1994 Post–Disparity Study. (Def.Exh. 21). In this Study, Dr. Boston tried to do what was not done in the Brimmer–Marshall Study, that is, to analyze Fulton County's utilization of female and minority contractors in relation to their availability. The 1994 MFBE Program states that the percentage goals for minority and female participation were based in part on methodology suggested by this study. (Pl. Exh. 1 at 17). The 1994 Post–Disparity study evaluated the utilization of minority or female vendors by Fulton County from 1990–1993, the four years immediately preceding the implementation of the program. In the 1994 Post–Disparity Study, Dr. Boston addresses whether there was a significant "disparity index" or "UPI", showing that Fulton County had underutilized minority and female contractors during that period. The conclusion of the study was that "[t]he current goals and utilization percentages are still below the levels that are warranted by the availability of minority and female vendors and by the extent of historical discrimination." (Def.Exh. 21).

The overall disparity index in evidence for the period 1990–93 is reflected in a document entitled "Fulton's UPI Calculation," created by Dr. Boston. (Def.Exh. 2). To calculate disparity indexes for Fulton County contracts, Dr. Boston sets out to determine the availability and utilization of minority and female firms. Two methods may be used to calculate availability: (1) bid analysis; or (2) bidder analysis. In a bid analysis, the analyst counts the number of bids submitted by minority or female firms over a period of time and divides it by the total number of bids submitted in the same period. In a bidder analysis, the analyst counts the number of minority or female firms submitting bids and divides it by the total number of firms which submitted bids

during the same period. Dr. Boston's availability calculations relied on the number of firms submitting bids rather than the gross number of bids.

In arriving at his availability percentages, Dr. Boston did not consider any data from Fulton County concerning the race and gender of firms who actually bid for contracts with Fulton County. He wanted to use Fulton County bid data, but he considered the data the County had to be faulty and inaccurate. Instead, he took the results of two previous studies he had performed for the City of Atlanta and the Atlanta School System and averaged them together. Dr. Boston used data covering the years 1978 through 1988 to compute the City of Atlanta availability. The availability figures for the City of Atlanta were derived from the number of different bid applicants over the ten-year period. He then used data for the years 1982 through 1992 to compute the Atlanta School System availability. The availability figures for the Atlanta School System were derived from the number of vendor applicants over the ten-year period. Dr. Boston found that the overall MFBE availability for the City of Atlanta was 28.3% and for the Atlanta School System 42.6%. Thus, the average availability was 35.45%. Dr. Boston then adjusted the availability results by the number of certified MFBE firms certified in Fulton County in 1994, the total number being 699. Dr. Boston's "adjusted" availability for African–Americans was 28.6%, for White Females 3.55%, for Hispanics 1.22%, for Asians 1.83%, and for Native Americans 0.25%. (Def. Exh. 2; Def. Exh. 21 at Table 19(a)).

In measuring utilization, Dr. Boston relied on data collected from the Fulton County Uniform Contract Sign–Off Sheets. (Def. Exh. 21 at 21, Table 1). Table 1 in the 1994 Post–Disparity Study shows minority utilization of 13.50% in 1990, 24.03% in 1991, 19.12% in 1992, and 23.22% in 1993. This table further shows female utilization of .22% in 1990, .03% in 1991,

1.63% in 1992, and 4.33% in 1993. The table contains the following caveat:

> Women vendors ... means women who are not elsewhere classified, primarily white women. However, a small number of minority women vendors are also included in this total. These women and are [sic] not also included in the minority total.

(*Id.* at Table 1). The utilization figures in this table were calculated by dividing the dollar awards to either minority or women vendors by the total dollar awards that year. Dr. Boston's 1994 Post–Disparity and his "Fulton's UPI Calculation" document reflect that the "Average utilization 1990–93" was 19.63% for "Minority" and 1.43% for "Females". (*Id.* at Table 19(b)).

Table 19(a)-(f) lists the relevant availability and utilization figures used by Dr. Boston to develop the methodology for deriving the one and five year goals of Fulton County. In dividing total minority average utilization by total adjusted minority availability (19.63%/31.90%), Dr. Boston calculates a UPI for the years 1990–1993 of 61.54%. The UPI for majority women (1.43%/3.55%) is calculated to be 40.28%. From these calculations, Dr. Boston sets forth his recommended goal for minorities at "29% starting in 1995 and increasing by one percentage point over the next five years to 33%." (*Id.* at Table 19(d)). His recommended goal for females is 6% beginning in 1995 and increasing by one percentage point over each of the next five years to 10%. (*Id.*). In order to determine whether Dr. Boston's Study provides a strong basis in evidence to justify a racial preference program, the Court must examine both the data utilized by Dr. Boston and the methodology employed by him in analyzing the data. The evidence introduced at trial reveals serious flaws in both the data and the methodology employed by Dr. Boston.

First, following *Croson*, Fulton County is justified in adopting a program of racial preferences if it can show a strong statistical disparity between the availability of minority firms and their utilization by Ful-

ton County. The two crucial numbers then are availability and utilization. Dr. Boston's availability numbers are set forth in Table 19(a) as follows:

| | |
|---|---|
| Blacks | 28.60% |
| White Females | 3.55% |
| Hispanics | 1.22% |
| Asians | 1.83% |
| Native Americans | 0.25% |
| Percent of all available firms | 35.45% |

No explanation is given in the Study itself as to the source of these numbers or any indication of their accuracy or reliability. Given the critical importance of the availability figures, the absence of any explanation as to their origin is very troubling. Dr. Boston's utilization numbers are set forth in Table 19(c) as follows:

| | |
|---|---|
| Average utilization of minorities, 1977–93 | 18.90% |
| Average utilization of minorities, 1990–93 | 19.63% |
| Average utilization of majority females, 1990–93 | 1.43% |

Dr. Boston explained that he obtained these numbers from examining the uniform contract sign off sheets employed by Fulton County for all contracts. He also explained the differences between his numbers and the numbers reported to the Board that included only contracts exceeding $20,000. (Def. Exh. 21, Table 2). Using these numbers. Dr. Boston obtains the following disparity ratios:

| | |
|---|---|
| Minorities, 1977–93 | 59.25% |
| Minorities, 1990–93 | 61.54% |
| Majority females, 1990–93 | 40.28% |

Using these disparity ratios, Dr. Boston arrived at five year goals of 33% for minorities and 10% for females. His explanation for his methodology in reaching this overall goal of 43% was as follows:

> The goals in Table 19(d) have been derived through the use of a proprietary methodology developed by Dr. Boston. This method has also been used to derive goals for the City of Atlanta and The Atlanta School System. It takes into consideration the disparity that firms have/are encountering, their availability in the market place and the awards they would have received but for

discrimination. The recommended goal for minorities is 29% starting in 1995 and increasing by one percentage point over the next five years to 33% (see Tables 19 d & e). The recommended goal for females is 6% starting in 1995 and increasing by one percentage point each year for the next five years to 10%. (Def. Exh. 21 at 37–38). On June 15, 1994, Dr. Boston presented his Study to the Fulton County Board of Commissioners. The Board voted to adopt the Study without any discussion of the validity of his data or his analysis. The 1994 MFBE Program contains the minority and female preference goals recommended by Dr. Boston for 1995.

At trial, Dr. Boston testified as to the source of his availability data. He testified that the data was derived in part from a study that he did that was incorporated in an Addendum to the Brimmer–Marshall Study. (Def.Exh. 14). No evidence was offered that this study was ever presented to or considered by Fulton County in adopting its MFBE Program. Therefore, the Court admitted the study only for the limited purpose of serving as a foundation to Dr. Boston's expert testimony. Based upon his analysis of the number of companies submitting bids to the City of Atlanta from 1978 to 1989, Dr. Boston determined that total MFBE availability was 28.30%. At trial, he testified that he did another study of availability for the Atlanta School System and found total MFBE availability of 42.60%. He averaged those two figures to get the total 35% MFBE availability that is contained in Table 19(a) of the Post–Disparity Study.

The Court finds that Dr. Boston's 35% MFBE availability number is unreliable for numerous reasons. It is based upon the assumption that there is at least a close approximation between the availability of MFBEs to the City of Atlanta and the Atlanta School System and the availability of such firms to Fulton County. Based on the evidence at trial, the Court is not willing to make that assumption. Only 50% of the minority firms certified by the City of Atlanta were also certified by Ful-

ton County. The geographical bounds and the populations of Atlanta and Fulton County are different. Although there is a geographic overlap of roughly 50% between the City and Fulton County, the part of the County that lies outside the city limits has a substantially different racial composition than the City. The undisputed evidence showed that roughly 90% of all African–American businesses in Fulton County lie inside the City of Atlanta. The businesses located in areas of north Fulton County range between 81% and 100% white. Common sense suggests that the percentage of African–American businesses available to Fulton County is likely lower than the percentage available to the City of Atlanta or the Atlanta School System.

Another problem arises when Dr. Boston's availability, as measured by bidders, is compared with utilization, as measured by contract dollars, to produce a disparity ratio. The cross examination of Dr. Boston persuades the Court that counting bidders greatly overstates the true availability of minority firms to the City of Atlanta during the period of the Study because it does not take into account the actual relative unavailability of minority firms to bid on and obtain large construction contracts. Furthermore, the services provided by Fulton County are very different from those provided by the Atlanta School System. For all of these reasons, the Court concludes that the availability numbers contained in the Post–Disparity Study are not reliable.

Furthermore, more reliable data is available to indicate that Dr. Boston has vastly overstated the availability of minority firms in the Atlanta metropolitan area. Dr. Marshall has described the Census Bureau's 1987 and 1992 SMOBE and the 1990 decennial census microdata as "the most recent and comprehensive data available that allow direct comparisons between minority and non-minority male-owned businesses and business owners." (Def. Exh. 235 at 21). Dr. Marshall testified at

trial that "these are numbers that are produced by official government services and are very reliable and if they are not reliable, they give you information to tell you why they are not." Dr. Wainwright at trial described the SMOBE data as "one of the finest sources available." This data indicates availability in the Atlanta SMSA of all African–American firms of 7.4% in 1987 and 9.9% in 1992. (Def. Exh. 235, Exh. A, Tables D and E). This compares with Dr. Boston's availability figure of 28.60% for African American firms. (Def. Exh. 21, Table 19(a)). The reasons given by Dr. Boston for not using census data are not persuasive. This is the same data that Dr. Marshall and Dr. Wainwright relied upon in the Brimmer–Marshall Study and their later reports. If anything, the census data overstates minority availability because publicly-owned corporations are not included. For all of these reasons, the Court declines to accept Dr. Boston's measure of the availability of MFBE firms to Fulton County. With flawed availability data, Dr. Boston's disparity ratios collapse as well.

Even if the disparity ratios were valid, the Court rejects Dr. Boston's methodology for using them to arrive at goals for minority participation. Dr. Boston's goals are derived through a methodology developed by him in connection with a similar project to derive minority and female goals for the City of Atlanta. (Def.Exh. 14). Dr. Boston's goal methodology is set forth in a letter to Rodney Strong, Director of the City of Atlanta's Office of Contract Compliance. (*Id.*). Dr. Boston's methodology is rather complex. Dr. Boston examined City of Atlanta contract data that spanned a ten-year period to determine the average availability and utilization of African–Americans, females, Hispanics, Asians, and Native–Americans in the City of Atlanta. Thus, the ten-year average UPI was calculated to be .56 for African–Americans, .08 for females, .017 for Hispanics, .122 for Asians, and .017 for Native–Americans. Dr. Boston then calculated the ten-year average disparity, which is formulated as (1–UPI). Thus, using Afri-

can–Americans as the primary example, the ten-year average disparity was reported as .44.

In the next part of Dr. Boston's methodology, he sets forth a method to determine the average percentage of the disparity due to discrimination. To make this determination, Dr. Boston lists ten adjustment or discriminatory factors that might cause a disparity in minority contracting in the City of Atlanta: (1) anecdotal evidence of discrimination; (2) historical/descriptive documentation of discrimination; (3) contract disparity before the MFBE program; (4) exclusion from trade organizations; (5) discrimination in local income and employment; (6) exclusion from private sector; (7) discrimination in lending; (8) discrimination in bonding; (9) market UPI; and (10) public testimony. He weighted each of these factors equally at 10% each. He then assigned each of these factors a number between 1.00 and 0, representing in effect a percentage between 0% and 100%. Dr. Boston then added up the ten percentages. If the total percent equaled 100, then Boston concluded that the disparity was caused entirely by discrimination. Dr. Boston testified that he, along with Rodney Strong and one other, assigned each adjustment factor. After making each assignment, Dr. Boston determined the average percentage of disparity due to discrimination to be 73% for African–Americans, 6% for women, 12% for Hispanics, 10% for Asians and 4% for Native–Americans.

Dr. Boston then multiplied the ten-year average disparity by the average percentage of disparity due to discrimination to reach a ten-year average disparity due to discrimination. For African–Americans, this number was .32. The ten-year average disparity due to discrimination was added to the ten-year average UPI to arrive at the ten-year average UPI but for discrimination. Dr. Boston determined this number to be .88 regarding African–Americans. Dr. Boston then multiplied .88 by the ten year average availability percentage to calculate the ten-year utilization

but for discrimination, which was .23. Dr. Boston subtracted the ten-year average utilization percentage from .23 to arrive at the ten-year average underutilization due to discrimination. Finally, Dr. Boston added the ten-year utilization but for discrimination (.23) to the ten-year average underutilization due to discrimination to arrive at the final recommended goal for the City of Atlanta of 31% for African–Americans. In contrast to the City of Atlanta Study, the 1994–Post–Disparity Study does not detail this methodology in computing Fulton County's MFBE goals for the years 1994–1999.

The Court finds Dr. Boston's methodology for determining the degree of disparity due to discrimination to be an unacceptable basis for making this determination. The accepted method of controlling for independent variables is a statistical regression analysis. Instead of that, Dr. Boston utilized this novel method of listing ten ways of proving discrimination, weighing them equally according to the subjective assessment of three individuals and then using the average as the amount of disparity due to discrimination. No explanation is given for the enormous differences that are produced, for example, between African–Americans and Hispanics. The Court is not persuaded that this methodology produces any reliable information.

Although Dr. Boston followed the same methodology in the Fulton County study as in the City of Atlanta study, he did not give the same amount of detail. For overall minority amounts, he transferred the African–American result of 73% from the City of Atlanta study and applied it to all minorities, even though the City of Atlanta Study concluded that minorities other than African–Americans had much lower disparities due to discrimination than African–Americans. The subjective nature of the analysis is illustrated by the fact that Dr. Boston changed the adjustment factor for females based upon a "conversation" with Mr. Cooper about the public hearing on discrimination against females in the marketplace. The goal of 35% MFBE participation is based on a subjective process rather than sound statistical methods. Moreover, Dr. Boston's recommendation to increase the MBE participation by 1% a year without a sound statistical foundation further illustrates the arbitrariness and unreliability of Dr. Boston's methodology. In conclusion, the goal setting methodology referenced in the 1994 MFBE Program is arbitrary and completely unreliable.

The third basic flaw is that Dr. Boston did not use scientific methods to account for disparities for reasons other than discrimination. In connection with his post-disparity study, Dr. Boston never conducted a regression analysis to see whether the underutilization of MFBEs was due to discrimination or was due primarily to other neutral factors such as firm size, inability to obtain bonding, or inability to obtain financing. The Court has before it no sound statistical method to show that the disparity in the years 1990–1993 were due either to discrimination or neutral factors. It is worth noting that Dr. Boston's study only calculates utilization figures for MBEs as a group and does not calculate separate utilization figures for African–Americans, Asians, Hispanics, and Native–Americans. Finally, in arriving at the utilization results based on the amount of dollars awarded, Dr. Boston relied on Fulton County records. These records show that in contract awards under $40,000, MBEs received an average of 35% in the years 1990, 1991, and 1993. When you factor in 1992, the average utilization falls to 32%. In contracts between $40,000 and $100,000, the average utilization of MBEs for the years 1990–1993 is approximately 29%. In contracts between $100,000 and $1 million, the average utilization of MBEs for the years 1990–1993 is 39%. Overall, MBE utilization on contracts less than $1 million, based on dollars awarded, is approximately 33%. In contracts over $1 million, the average utilization of MBEs for the years 1990–1993 dips to under 17%. Thus, when you factor in the high dollar contract awards going to majority firms, the overall utilization of MBEs based on the dollar of contract awards would natu-

rally decrease. The evidence suggests, however, that there are simply few minority bidders for the largest contracts due to the smaller average size of minority firms. A review of the evidence regarding bids on City of Atlanta contracts reveals that as the size of the contract awards increase to $20 million or more, the amount of MBEs even placing bids dips dramatically in comparison to majority firm bids. Even if there was a differential between the percent of minority firms bidding for these huge construction contracts and utilization of them, Fulton County would bear the burden of proving that the difference was due to its own discrimination, rather than other factors. Dr. Boston has performed no regression analysis to show that the disparities were either due to discrimination or other neutral grounds.

The evidence supports an inference that MBEs are not available to perform these contracts for reasons other than active or passive discrimination by the City of Atlanta or Fulton County. In the Brimmer–Marshall Study, a sample of construction firms in the Atlanta area indicated that 19% of the majority-owned firms had unlimited bonding capacity, while 0% of minority owned firms had unlimited capacity. (Def. Exh. 146, Part III at 237). In his report in the Brimmer–Marshall Study, Dr. Boston concluded that "[t]he greatest problems among MFBEs [seeking construction contracts] appear to be a low success rate at securing bonding and the inability to secure large or unlimited bonding capacity." (*Id.* at 138). Overall, the Court finds and concludes that the methodology and statistics outlined in the 1994 Post–Disparity Study fail to provide a strong basis in evidence of discrimination against MBEs to justify Fulton County's race and ethnic preference program. Given the flaws identified in his methodology, Dr. Boston's study fails to show "gross statistical disparities" between the proportion of MBEs hired for projects or contracts, and the proportion of minorities willing and able to do the work. *See Engineering Contractors*, 122 F.3d at 908.

The Court also finds that the 1994 Post–Disparity Study fails to demonstrate probative evidence sufficient to justify the 6% female participation goal. Dr. Boston's Post–Disparity Study fails to document proper utilization figures for Fulton County firms owned by females. In calculating utilization, most minority females are aggregated in the general minority category with some minority females added in the category of "Female NEC." (Def. Exh. 21 at Table 1). Thus, the utilization of FBEs appears to be entirely speculative. In taking availability data from the City of Atlanta and the Atlanta School System, Dr. Boston calculated an adjusted availability of 3.55%. To calculate participation goals for FBEs, Dr. Boston applies his fatally-flawed goal setting methodology. It is unclear from a document entitled "Fulton's UPI Calculation" whether Dr. Boston used the adjustment factors calculated with respect to determining disparity due to racial discrimination to the FBE goal calculation. (Def.Exh. 2). Nevertheless, the Court finds that the 6% FBE goal was arbitrarily reached based on the statistical methodology employed by Dr. Boston. In short, the 1994 Post–Disparity Study fails to provide sufficient probative evidence of gender discrimination to justify the preference goals of 6% for FBEs.

### c. The 1994–1997 Statistical Evidence

Both the Plaintiff and the Defendants have submitted statistical studies of data collected for the years 1994–1997. At the outset, the Court notes that the statistical conclusions reached in these studies are potentially skewed by the presence and active implementation of the 1994 MFBE Program. Some of the numbers are more likely to be affected by the operation of the program than others. For example, the number of contracts awarded is most likely to be affected by the Program; the number of bids submitted less so. Accordingly, the Court accords these studies less weight than it would give to studies performed closely before the program became effective. Nevertheless, these studies lend

more credence to the Court's conclusion that the Defendants have failed to demonstrate a strong basis in evidence justifying Fulton County's race and ethnic preference program.

The Plaintiff has submitted into evidence a study conducted by their expert, Dr. George Easton. (Pl.Exh. 208). Dr. Easton teaches statistics at the Emory Business School. In his Report, he found that MFBE had an average availability percentage of around 16% (9% African-American and 7% other minorities) for MBEs in the years 1994–1997. His figures were based on SMOBE census data. A special tabulation of the data by the Census Bureau showed 14.6% of small firms (i.e., proprietorships, partnerships and non-publicly held corporations) in the Atlanta SMSA were minority owned.[5] He assumed that minority and non-minority firms were equally willing and qualified to bid on Fulton County contracts. His analysis indicates that nonminorities are receiving from 11% to 17% less in Fulton County contract dollars than they should receive based upon their availability. Minorities are receiving an amount more than they should be receiving based upon availability. Dr. Eason's data results in disparity ratios of greater than 1.0 for minorities for each year in the period 1994–1997. The disparity ratios for majority firms exceed .80 for each year in question. Therefore, his data shows no discrimination against minorities and possible discrimination against nonminorities. Although the Defendants have identified potential flaws in his statistical significance calculations, the study supports the finding that no strong basis in evidence exists to justify Fulton County's race and ethnic program. If anything, Dr. Easton's data overstates the availability of minorities because the numbers exclude all corporations except Chapter S Corporations (those with 35 or fewer owners). Certainly, Dr. Easton's study is inconsistent with any gross statistical disparities in the availability and utilization of minorities by Fulton County.

Fulton County responded to Dr. Easton's study by producing the testimony contained in Dr. Boston's Amended Rebuttal Report. (Def.Exh. 17). Dr. Boston has performed a number of statistical studies with regard to the data collected for the years 1994–1997. In his Amendment to the Rebuttal Report, Dr. Boston performed a study in which he concluded that between 1994 and 1997 there was neither statistically significant underutilization of non-MFBEs nor overutilization of MFBEs in Fulton County's contracting activities. (Def.Exh. 19). At the bench trial, Dr. Boston stated that the statistical analysis in this report updated a previous report and was particularly reliable. Dr. Boston relied on the following Fulton County data in performing his statistical analysis: (1) the Board's Post-Agenda/Preliminary minutes; (2) Fulton County Purchasing Department Bid Tabulation Sheets for 1997; and (3) Request for Approval of Lowest Responsible Bidder data.

In computing MFBE and non-MFBE availability for the years 1994–1997, Dr. Boston relies on the number of bids submitted as opposed to the number of bidders. With regard to the award of contracts less than $20,000, he reported MFBE availability of 25.1% in 1994, 29.9% in 1995, 25.8% in 1996, and 23.1% in 1997. The average of these availability figures is 25.9%. The report further reflects utilization percentages of 26.8% in 1994, 32.1% in 1995, 37.2% in 1996, and 34.6% in 1997. Significantly, these figures produce disparity ratios of 1.06, 1.07, 1.44, and 1.49. Dr. Boston then performed standard deviation analysis based on the utilization and availability percentages. This analysis describes the probability that the measured disparity is the result of chance. The Eleventh Circuit has stated that scientists

---

5. Dr. Easton, Dr. Marshall and Dr. Wainright all agree that the appropriate marketplace to study availability is the Atlanta SMSA. Dr. Wainwright also agrees with Dr. Easton that the SMOBE data provides reliable estimates for the number of minority-owned firms in the Atlanta SMSA.

consider a finding of two standard deviations to be significant, which means that "there is about one chance in 20 that the explanation for the deviation could be random and the deviation must be accounted for by some factor other than chance." *Peightal v. Metropolitan Dade County,* 26 F.3d 1545, 1556 n. 16 (11th Cir.1994). According to Dr. Boston, the standard deviation calculations for each year indicate that non-MFBEs were not underutilized and MFBEs were not overutilized. Dr. Boston also conducted an analysis of contract awards over $20,000, but the Court can discern no availability figures for MFBEs and non-MFBEs.

The Court finds that this Dr. Boston's rebuttal study fails to provide a strong basis in evidence for the 1994 MFBE Program. It also fails to provide sufficient probative evidence to justify the gender preferences contained in the program. The study reports an average availability based on a liberal bid analysis of 25.9%. The study shows that from 1994–1997, MFBEs were overutilized to some extent, if not a statistically significant extent. The disparity ratios are all much greater than the .80 recognized as indicating significant disparity. *Engineering Contractors,* 122 F.3d at 914. The Court fails to see how such a finding could support a finding of discrimination against MFBEs sufficient to justify a 35% preference program for MFBEs. The County has also failed to submit any credible statistical analysis showing a gross disparity between the availability of minority and female firms and their utilization by Fulton County.

### 2. Anecdotal Evidence

The Court now turns to examine the anecdotal evidence presented by the Defendants to justify the 1994 MFBE Program. Fulton County has introduced a substantial amount of anecdotal evidence in connection with the Brimmer–Marshall Study and the 1994 Post–Disparity Study. As discussed above, anecdotal evidence may be used to establish discrimination, especially if buttressed by relevant statisti-

cal evidence. *Engineering Contractors,* 122 F.3d at 907. The Eleventh Circuit stated that:

> Anecdotal evidence can play an important role in bolstering statistical evidence, but that only in the rare case will anecdotal evidence suffice standing alone. While such evidence can doubtless show the perception and, on occasion, the existence of discrimination, it needs statistical underpinnings or comparable proof to show that substantial amounts of business were actually lost to minority or female contractors as the result of the discrimination.

*Id.* at 925–26. As Dr. Marshall acknowledged at trial, the problem with anecdotal evidence is that it is subject to "all kinds of biases." That is why it needs, in the words of the Eleventh Circuit, statistical underpinnings.

In Part II of the Brimmer–Marshall Study, the authors presented anecdotal evidence through confidential in-depth interviews of 76 individuals regarding the ongoing effects of past and present race and gender discrimination. (Def. Exh. 146, Brimmer–Marshall Study, Part II). The individuals interviewed included trade association representatives, MBE representatives, civic organization representatives, and public administrators who played some role in the development and implementation of MFBE programs. The interviewers painted a bleak picture of discriminatory practices in the Atlanta area, especially with regard to private sector discrimination. The interviewees reported difficulties and unfavorable experiences of racial, ethnic and gender discrimination in several areas, including (1) discrimination in bonding; (2) discrimination in financing; (3) discrimination in employment opportunities; (4) double standards in performance and qualifications; (5) limited access to private sector markets; and (5) stereotypical attitudes on the part of customers and buyers.

Further, Fulton County conducted open public hearings in 1992 in connection with

the Board's acceptance of the findings in the Brimmer–Marshall Study. At those hearings, numerous individuals provided further anecdotal evidence regarding their experiences in the Fulton County contracting and procurement activities and practices in the Atlanta/Fulton County marketplace. (Statement of Michael Cooper at 3). The individuals included construction contractors, MFBE owners, laborers, professionals, representatives from the City of Atlanta, and representatives of government agencies. The Court has reviewed the tapes of the hearing. Only two individuals testified to having experienced discrimination by Fulton County. One of these was a Native–American designer who complained bitterly that Fulton County uses the MFBE Program to benefit only African–Americans. The most common complaints were about bonding, insurance and other contract requirements that made it difficult for small or newer businesses to compete; the failure of County officials to return phone calls and other communication problems; the lack of capital and inability to obtain financing; slow payments by prime contractors; and minority and female businesses used as fronts for majority contractors. One minority contractor recognized that the desire of existing businesses to keep established clients is not in itself discrimination. The last witness, speaking on behalf of the National Association for Minority Contractors, testified that the MFBE Program should be used to transfer wealth to the black community. The anecdotal evidence presented at the public hearings is insufficient to support racial and ethnic preferences subject to strict scrutiny.

In the 1994 Post–Disparity Study, Dr. Boston conducted a random survey of 183 minority and female firms certified by Fulton County. (Def. Exh. 21 at 33). The number of total responses to the survey was 73. The distribution of respondents to the survey is as follows: (1) 72.7% African–American; (2) 16.7% majority female; (3) 4.2% Asian; (4) 1.4% Hispanic; and (5) 4.2% Native–American. In his survey, Dr. Boston found that 16% of those responding

agreed or strongly agreed that they have encountered discrimination at Fulton County in the past. (*Id.* at 34, Table 14). Approximately 12% agreed or strongly agreed that they are still encountering discrimination at Fulton County. The survey also found that (1) 52% agreed or strongly agreed that they have encountered discrimination in pursuing financing and credit in the last five years; (2) 20% agreed or strongly agreed that they have encountered bonding discrimination in the last five years; and (3) 53% agreed or strongly disagreed that they have encountered discrimination by majority-owned firms in the last five years. Overall, MBEs report that they still feel discriminated against, especially by majority firms. Dr. Boston also reports that there is a feeling that the MFBE programs are skewed to assist African–American vendors. (*Id.* at 35, Table 16).

The anecdotal evidence reflects the honest and concerned beliefs of many in the Atlanta and Fulton County area that they have been or are the victims of discriminatory practices. However, the anecdotal evidence alone is insufficient to provide the strong basis in evidence to justify the racial and ethnic preferences or sufficient probative evidence to justify the gender preferences of the 1994 MFBE Program. It is insufficient to offset the weaknesses of Fulton County's statistical evidence. The Court notes that much of the anecdotal evidence offered supports the identification of discrimination in the private sector and not by Fulton County. This is clearly not the exceptional case where anecdotal evidence standing alone may justify a race, ethnic or gender preference program.

## D. NARROW TAILORING AND SUBSTANTIAL RELATIONSHIP

As the Eleventh Circuit did in *Engineering Contractors*, the Court will proceed with the narrow tailoring analysis notwithstanding the finding that the 1994 MFBE program does not rest on an ade-

quate evidentiary foundation. The Eleventh Circuit has made it clear that the essence of this inquiry is whether racial preferences were adopted only as a "last resort." *Engineering Contractors*, 122 F.3d at 926. The Eleventh Circuit has identified four factors that should be taken into account: (1) the necessity for the relief and the efficacy of alternative remedies; (2) the flexibility and duration of the relief, including the availability of waiver provisions; (3) the relationship of numerical goals to the relevant market; and (4) the impact of the relief on the rights of innocent third parties. *Id.* at 927 (citing *Ensley Branch*, 31 F.3d at 1569).

Fulton County's 1994 MFBE Program fails this test on several grounds. First, it is not the law in the Eleventh Circuit that the existence of a race-based problem necessitates a race-based remedy. "If a race-neutral remedy is sufficient to cure a race-based problem, then a race-conscious remedy can never be narrowly tailored to that problem." *Engineering Contractors*, 122 F.3d at 927. There is no evidence that the Fulton County government has itself discriminated against minorities or females in the decades of the 1980s and 1990s. It has had available to it the race-neutral remedies identified by the Supreme Court in *Croson*, 488 U.S. at 509–10, 109 S.Ct. at 730–31, and by the Eleventh Circuit in *Engineering Contractors*, 122 F.3d at 928. During this period, a majority of the Commissioners on the Board have been African–American. However, Fulton County has been operating a racial and ethnic preference program for most of the last two decades. The program is now defended entirely on the basis of discrimination in the private sector. While it has paid lip service since *Croson*, the Court is not persuaded that it has seriously considered race-neutral remedies. There is no evidence in the record that any Commissioner has offered a resolution during this period substituting a program of race-neutral measures as an alternative to numerical set asides based upon race and ethnicity. There is no evidence in the record of any proposal by the staff of Fulton County of substituting a program of race-neutral measures as an alternative to numerical set asides based upon race and ethnicity. There has been no evidence offered of any debate within the Commission about substituting a program of race-neutral measures as an alternative to numerical set asides based upon race and ethnicity. Dr. Marshall and Dr. Boston both testified that they were not asked to study the efficacy of race-neutral measures. Dr. Marshall's argument at trial that race neutral measures are more expensive than preferences is entitled to no weight in light of *Croson*. It is instructive to return to *Croson* where Justice O'Connor stated:

> Where there is a significant statistical disparity between the number of qualified minority contractors willing and able to perform a particular service and the number of such contractors actually engaged by the locality or the locality's prime contractors, an inference of discriminatory exclusion could arise. Under such circumstances, the city could act to dismantle the closed business system by taking appropriate measures against those who discriminate on the basis of race or other illegitimate criteria.

*Croson*, 488 U.S. at 509, 109 S.Ct. at 730 (citations omitted). There is no evidence that Fulton County has made any attempt to identify majority contractors, lenders, bonding companies, or others who discriminate against minority business enterprises. Thus, those who are disfavored by the program are not those who have engaged in discrimination. Similarly, those who are favored by the program are not necessarily those who have suffered from discrimination.

The "random inclusion" of ethnic or racial groups who may never have suffered from discrimination further suggests that Fulton County's remedy for discrimination is not narrowly tailored to a remedial purpose. *Croson*, 488 U.S. at 506, 109 S.Ct. at 728. It appears that participation goals for Hispanics, Asians and Native–Ameri-

cans were added to the program solely to boost the overall minority participation percentage. There is no evidence that Fulton County considered alternatives to ethnic preferences with respect to minorities other than African–Americans. As in *Engineering Contractors*, "[i]t is clear as window glass that the County gave not the slightest consideration to any alternative to a Hispanic affirmative action program. Awarding construction contracts based upon ethnicity is what the County wanted to do, and all it considered doing, insofar as Hispanics were concerned." *Engineering Contractors*, 122 F.3d at 928. There is no evidence that race neutral measures were initiated on a trial basis and failed. See *Cone Corporation v. Hillsborough County*, 908 F.2d 908 (11th Cir.), cert. denied, 498 U.S. 983, 111 S.Ct. 516; 112 L.Ed.2d 528 (1990). Fulton County offered no evidence to refute the testimony of former Chairman Skandalakis that no consideration was ever given to substituting a program of race neutral measures as an alternative to numerical set asides based upon race and ethnicity. Accordingly, the Court has no alternative but to accept that testimony as credible and worthy of belief. Mr. Skandalakis further testified that he voted in favor of the 1994 MFBE program to advance his own political agenda by accommodating the African–American majority on the Board rather than to remedy the effects of past discrimination. This is the sort of "racial politics" condemned by Justice O'Connor in *Croson*. The racial and ethnic preferences adopted in the 1994 MFBE program were not adopted as a "last resort" and fail the "narrow tailoring" test for this reason.

Second, for all of the reasons set forth above, there is no substantial relationship between the numerical goals and the relevant market. There is no credible evidence that minorities and women accounted for 35% of the business enterprises ready and willing to bid on and perform contracts for Fulton County in 1994 or in any subsequent year. Dr. Boston testified that the 35% goal that he recommended was arrived at only by adding to current availability some conjectural percentage to compensate minorities for past discrimination. Dr. Marshall testified that minority participation goals must be set higher than current availability in order to compensate minorities for past discrimination and lack of opportunity in the private sector. This may be good public policy. However, it is inconsistent with Justice O'Connor's analysis in *Croson* as followed by the Eleventh Circuit in *Engineering Contractors*.

With respect to the narrow tailoring analysis, the County contends that the program should be upheld because it sets "goals" rather than mandatory quotas and that it has liberal waiver provisions. The Fulton County 1994 MFBE program is in all significant respects identical to the Dade County program struck down in *Engineering Contractors*. The Dade County program also utilized participation "goals" and had a waiver provision. In this regard, the Court accepts as credible the testimony of Thomas Bruns that various contracting procedures were employed by Fulton County department heads, buyers and the Office of Contract Compliance to award contracts to minorities in order to achieve the numerical percentages established by the program. The Court accepts this testimony as credible because it is corroborated by the documentary evidence from the bid files. The procedures used to achieve the participation goals included disqualifying majority firm bidders for failing to comply with the program (Pl. Exh. 3–25), awarding contracts to higher bidders in order to obtain minority participation (Pl.Exh. 35, 37), splitting bids so that minority firms received part of a contract when a majority firm was the overall low bidder (Pl.Exh. 49–54), solicitation of minority firms after bids were closed (Pl. Exh. 56, 57), rebidding contracts in order to obtain minority participation (Pl. Exh.58), treatment of the participation goals as mandatory requirements (Pl.Exh. 64–66, 70, 71, 116), awarding "points" for minority participation in evaluation criteria (Pl.Exh. 73–77), and awarding an entire contract to minority vendor overall

low bidders rather than splitting the contract to give part to majority firms low bidding on some items (Pl.Exh. 78–84). The rebuttal testimony of Mr. Cooper offered by the County as to these examples of the practices identified by Mr. Bruns either fails to address the exhibits relied upon by the Court or is contradicted by the documents. It is undisputed that compliance with the 1994 MFBE Program was a factor in determining whether a bid was considered a "responsible" bid. Yes, the Program is flexible where no minority contractors are available. However, it is also clear that the Program as implemented classified firms according to race and ethnicity and preferred certain races and ethnic groups over others.

In response to Bruns' testimony, the Defendant presented the testimony of Commissioners Hightower, Darnell and Boxill. They each testified that it is not the policy of Fulton County to award contracts on the basis of race, ethnicity or gender; that it is not the policy of Fulton County to threaten vendors with rejection of bids if they do not comply with the MFBE Program; that it is not the policy of Fulton County to require the mandatory satisfaction of any specific percentage participation by MFBEs in County contracting; that it is not the policy of Fulton County to reject bids by majority contractors if they fail to comply with the MFBE Program; that it is not the policy of Fulton County to steer professional services contracts to minorities; and that it is not the policy of Fulton County to employ the practices identified by Mr. Bruns to ensure that minority firms receive Fulton County contracts. Similar testimony was given by the former head of Contract Compliance and the current and former Purchasing Directors. Accepting their testimony as being true, the high levels of minority and female participation in Fulton County contracting have been achieved without a policy of discriminating on the basis of race or gender. Therefore, there is no need to maintain as official County policy a MFBE Program that authorizes discrimination by race, ethnicity and gender. Furthermore,

if the Court accepts their testimony as true, there is no reason to believe that abolishing the official policy of race and gender preferences will result in fewer contracting opportunities for women and minorities.

Finally, the Program does have a sunset provision providing for expiration of the Program in September, 1999. However, the Sunset provision also provides:

This Program may be extended for an additional five (5) year period, if the Board of Commissioners after review and consideration of all annual and other reports, other relevant information and public hearing testimony, finds that there is a continuing need for the Policy because its purposes and objectives have not been achieved.

(Pl. Exh. 1 at 55). No evidence was offered of any intention on the part of Fulton County to allow the 1994 MFBE Program to expire. The legality of the Program was vigorously defended at trial. The Court infers from this that the County believes there is a continuing need for the Program and that it will be continued unless enjoined by this Court. For each of these reasons, the Court finds that the County has not met its burden of showing that the race and ethnic preferences of the 1994 MFBE Program are narrowly tailored to achieve a compelling governmental interest.

If the gender preferences of the Fulton County MFBE Program should be analyzed by the narrow tailoring analysis applied to the racial preferences, the gender preferences would fall for the same reasons. However, the standard the Eleventh Circuit has established for considering gender preferences is much different than that for racial preferences. Again, the Court must follow the analysis set forth in *Engineering Contractors:*

When a gender-conscious affirmative action program rests on a sufficient evidentiary foundation, the government is not required to implement the program only as a last resort. Under intermediate scrutiny, the government may imple-

ment a gender preference so long as it can show that the program is substantially related to an important government interest.... Additionally, under intermediate scrutiny, a gender-conscious program need not closely tie its numerical goals to the proportion of qualified women in the market.

*Engineering Contractors*, 122 F.3d at 929. The County's gender preference program was not adopted as a last resort. However, it is sufficiently flexible to satisfy the intermediate standard of a substantial relationship to the County's stated rationale. However, because of the County's failure to present sufficient probative evidence of discrimination by the County or passive participation by the County in discrimination against women, the gender preferences must fail as well.

## III. CONCLUSION

In summary, Fulton County has operated a minority and female preference program for most of the past two decades. The program has been good for economic development in the minority business community. Historically, minorities have been the victims of pervasive discrimination in all facets of economic enterprise. As a matter of good public policy, this alone might justify minority set aside programs by public agencies. Nonetheless, the Supreme Court has held that such programs involving racial or ethnic preferences must be subjected to strict scrutiny. Applying the high standards set by the Supreme Court and the Eleventh Circuit, the Fulton County 1994 MFBE Program cannot survive strict scrutiny with respect to the evidentiary foundation for such a program or its narrow tailoring to meet a compelling governmental interest. There is no evidence that the Fulton County Government has significantly or systematically discriminated against African–American or other minority businesses in the decades of the 1980s and 1990s. There is insuffi-

cient evidence that it has become a passive participant in a pervasive system of discrimination in the private sector and that racial and ethnic preferences have been adopted as a last resort to eliminate that discrimination. The program itself does nothing to remedy discrimination in private sector contracting. The goals set by the program are not based upon any realistic assessment of the availability of minority business enterprises in the Atlanta metropolitan marketplace. Likewise, Fulton County has not produced sufficient probative evidence of discrimination against female business enterprises to justify a gender preference program. Therefore, race, ethnic and gender balancing in Fulton County contracting must end.

For the reasons set forth above, the Court sitting as the trier of fact finds in favor of the Plaintiff Webster Green Thumb as to its claim that the Fulton County 1994 Minority and Female Business Enterprise Program is unconstitutional. Therefore, Defendant Fulton County is hereby permanently enjoined from using racial, ethnic or gender participation goals in accepting or rejecting bids, determining whether bidders are responsive and responsible bidders and in the awarding of Fulton County contracts. There being no reason for delay, pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, the Clerk is directed to enter a Final Judgment consistent with this Order as to the claim for declaratory and equitable relief of Plaintiff Webster Green Thumb Company. Counsel are directed to contact the Court's Courtroom Deputy Clerk to schedule a status conference regarding the trial of the Plaintiff's damage claims and any other proceedings to be had in this matter.